Filed 9/20/23; Certified for Publication 10/18/23 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JAN F., | B322439 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. 20STPT02373) |
| v. | |
| NATALIE F., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Elizabeth Scully, Judge. Reversed and remanded with directions.

Family Violence Appellate Project, Jodi Lewis, Arati Vasan, Jennafer D. Wagner; Crowell & Moring, Joachim B. Steinberg, and Laura Foggan for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

———————————

Natalie F. (Mother) and Jan F. (Father) are parents of a now six-year-old girl, M.F., and three-year-old boy, O.F.[1] In January 2022, Mother sought a restraining order under the Domestic Violence Prevention Act (DVPA; Fam. Code,[2] § 6200 et seq.) against Father. She claimed she suffered abuse within the meaning of the DVPA as a result of Father making false police reports to the Santa Monica Police Department (SMPD) to conduct welfare checks on the children while they were in Mother's care and sending her and her attorney over 130 harassing messages via email and the communication platform Our Family Wizard (OFW) over a 40-day period.

Following an evidentiary hearing limited to the consideration of Mother's Judicial Council form DV-100 restraining order request and attached exhibits, the family court denied Mother's request for a domestic violence restraining order (DVRO), finding Father's actions as alleged by Mother did not constitute abuse under the DVPA. The court explained it would not restrain Father from contacting the SMPD "in advance" because he might have sincere concerns about the children's welfare. It further explained that Father had a First Amendment right to communicate regarding litigation matters. It observed Mother could obtain some of the relief she sought in

---

[1] We use abbreviations to protect the personal privacy of children in a Family Code proceeding as well as Mother given that this appeal involves domestic violence prevention. (Cal. Rules of Court, rule 8.90(b)(1), (11).)

[2] All unspecified statutory references are to the Family Code.

2

an upcoming long cause custody hearing scheduled before another judicial officer.

Mother argues the family court erred in denying her DVRO request because Father's actions amounted to abuse, and the First Amendment does not protect such conduct. She further argues that regardless of whether she could seek a remedy in the custody proceedings, she was still entitled to a DVRO.

We conclude that based on the limited evidence before it, the family court erred in denying the DVRO. Mother adduced evidence that Father made multiple requests for police welfare checks not for any legitimate reason but based on false information to harass her. If fully credited, that evidence alone was sufficient to demonstrate abuse under the DVPA and to require the issuance of a DVRO, and the court erred in finding otherwise. We say if fully credited, because the court did not permit Father to offer testimony or evidence that he had legitimate concerns when he made these calls, or any other evidence for that matter. In fact, when Father began to attempt setting forth such evidence, the court advised Father that it had already ruled in his favor and did not need to hear his reasons for calling the police. Accordingly, we reverse and remand the matter for an evidentiary hearing where the court can hear from both parties.

## FACTUAL AND PROCEDRAL BACKGROUND[3]

### A.     The Parentage Action and the Interim Custody and Visitation Order

M.F. was born in 2017, and O.F was born in 2019.  In October 2020, Father filed the underlying action to establish parentage of the children and to obtain court orders for custody and visitation.

On March 25, 2021, the family court granted on an interim basis sole legal and physical custody of the children to Mother.  The court also granted Father in-person monitored visitation with the children once a week and video calls with them every Tuesday and Thursday at 8:00 p.m. for up to 15 minutes.  The supervised visitation order provided that "[e]vidence has been presented in support of a request that the contact of [Father] with the child(ren) be supervised based upon allegations of

---

[3] Father did not file a respondent's brief.  Instead, on June 23, 2023, Father filed his declaration dated May 23, 2023, and several exhibits with this court.  Mother filed a motion to strike these documents.  Because none of Father's submission was before the family court when it ruled on Mother's DVRO request, we grant Mother's motion.  We also decline to consider documents that Mother submitted with her appeal that were not before the family court, including the reporter's transcripts for January 25, 2021 (which was a hearing in front of a different judicial officer than the one that heard the DVRO request) and April 18, 2022 (which was a hearing that occurred after the court denied the DVRO request at issue in this appeal).  (*In re Zeth S.* (2003) 31 Cal.4th 396, 405 ["It has long been the general rule and understanding that 'an appeal reviews the correctness of a judgment as of the time of its rendition, upon a record of matters which were before the trial court for its consideration' "].)

abduction of child(ren), domestic violence, [and] alcohol abuse." However, the court noted the allegations were disputed and that it "reserves the findings on these issues pending further investigation and hearing or trial." The court further ordered the parents use OFW "as their exclusive communication platform [and that a]ll communications [through] OFW . . . be limited to communications regarding the children."

## B.    Mother's Request for a DVRO

On January 3, 2022, Mother filed a request for a DVRO on Judicial Council form DV-100. She also filed a declaration and exhibits in support of her request. In her declaration, Mother stated that on November 23, 2021, the family court prohibited her from taking the children to New York for the holidays. It also "suspended [Father]'s visitation [with the children] pending completion of one session of co-parenting therapy." She claimed that since then, Father "has been increasingly harassing me, directly and indirectly, to the point that I fear for my safety and well[-]being." (Bold omitted.)

### 1.    *SMPD Welfare Checks*

Mother declared that Father called the SMPD for welfare checks on December 9, 15, 21, 23, 25, 28, and 30, 2021. She asserted Father was using the police to harass her and disturb her peace. Each time, SMPD called Mother and asked for her address. She explained to SMPD that she obtained housing through a domestic violence group, that Father was the perpetrator of the domestic violence,[4] and that she would not give

---

[4] We repeat only what Mother stated in her declaration. The record does not include any factual finding that Father committed acts of domestic violence against Mother.

5

out her address because she feared for her safety if Father obtained it.

There is nothing in the record describing the circumstances surrounding Father's call to the SMPD for a welfare check on December 9, 2021.

On December 14, 2021, Father, as he put it in an OFW message, "wrongly assumed [Mother] had not attempted to reach [him]," but later saw Mother's "attempts to call [him]." He apologized and requested that Mother allow him to make up the call the following day, December 15. Mother told Father that she and the children were not available for the make-up call. According to Mother, "because I did not meet [Father]'s demand, he called SMPD . . . for a welfare check." There is no evidence in the record to contradict Mother's assertion.

Mother declared that on December 21, 2021, she did not receive a call from Father at 8:00 p.m., the time at which he was to have video calls with the children. At 8:10 p.m., Father called the SMPD for a welfare check. Thereafter, Father sent an email to Mother and her attorney in which he claimed Mother was not answering his calls, accused Mother of disappearing, and stated that he called the SMPD to investigate where the children were. Mother spoke with an SMPD officer who called Mother at 10:18 p.m. The officer called her again at 11:03 p.m. to ask if she was in California. She confirmed that she was. At 11:16 p.m., Father sent a message to Mother in which he indicated he had spoken with the SMPD officer after the officer had spoken with her. He called Mother and her attorney liars and told Mother to "[s]leep well with your evil ways." A printout of a call log from Father's phone shows five canceled calls between 8:00 and 8:06 p.m.

Mother declared that M.F. had been watching a movie on the iPad and Mother had not seen a call come through.

On December 22, 2021, Father sent five to seven messages to Mother and her attorney. Father "attempted to . . . call [the children that morning] to discover where you are harboring our children this morning and last night." He claimed to have "opened a criminal investigation on a multitude of fronts as it pertains to your conduct and disappearance last night." He also requested that Mother schedule and confirm a 7:00 p.m. make-up video call for Christmas Eve.

On December 23, 2021 at 6:29 a.m., Father sent a several-paragraphs message to Mother accusing her of, inter alia, making false statements and ignoring his messages. Father concluded the message stating, "I'm asking to visit with our children on [December 24, 2021] at 7[:00 p.m.]" At 12:09 p.m. that day, a SMPD officer contacted Mother and requested her address to conduct a welfare check. According to Mother, the officer informed her that he needed to conduct the welfare check because she had missed a "court[-]ordered phone call with [Father]" and Father believed Mother was out of state with the children. Mother informed the officer that she had not missed a call as the next scheduled call was for 8:00 p.m. that evening. Father called the SMPD at 8:35 p.m. that evening, but the record does not indicate any reason for Father to have done so.

On December 25, 2021, Father sent a text message to Mother at 9:03 a.m. stating that Mother had scheduled a make-up Christmas day call at 9:00 a.m., and that it was unacceptable for her to miss the call. Father then called the SMPD at 9:10 a.m. He sent Mother a second text at 10:32 a.m., stating that his mother wanted to meet the children and to coordinate

with her. Father texted again at 7:10 p.m. and claimed that Mother coached M.F. to ask Father if she could call him later.

On December 28, 2021, Mother sent a message to Father at 7:09 p.m., and again at 7:50 p.m., to inform him that they would not be available for a call until 8:30 p.m. that evening. Mother sent another message stating that the children would call him closer to 8:45 p.m. O.F. called Father at 8:43 p.m. Father had called the SMPD at 8:06 p.m.

On Thursday, December 30, 2021, Father did not call the children. At 8:16 p.m., Mother sent an OFW message to Father asking if he would be calling or if he needed to reschedule. The SMPD service report shows Father called SMPD at 8:09 p.m. The report includes a notation of "[c]hild [s]tealing" under the column heading "[i]ncident [t]ype."

2. *Email, OFW, and Text Messages*

Mother declared that Father "sent well over 100 emails and 37 OFW messages since . . . November 23, 2021 . . . . All have been accusatory, argumentative, and abusive towards me and/or my attorney."

Mother did not attach all these messages to her declaration, nor do we summarize each message she did attach. Suffice it to say, Father's messages are full of accusations, including that Mother and her attorney were liars, arrogant and ignorant as to the best interests of the children, dangerous, outrageous, perpetuating false narratives, in contempt of court, engaging in conduct that was grounds for disbarment, and coaching and brainwashing the children. He further stated that Mother had "false calls with DCFS," that Mother was attempting to create a loyalty conflict with the children, which "is punishable by law under a form of psychological mental[ ](emotional) child

8

abuse," that Mother maliciously defamed his character, that "any . . . competent [j]udge within the [f]amily [l]aw [c]ourt[]s of [the] entire [c]ountry would agree[] it is alarming that a four[-]year[-]old is placed in therapy," that Mother's and counsel's legal positions are "garbage" and "juvenile games," that they created a "venomous trail of lies," and that Mother's and counsel's conduct has "deeply affected the well[-]being" of the children.

The court denied a temporary restraining order and set the matter for a hearing on January 25, 2022. Prior to the hearing, Father did not file any responsive documents or evidence in opposition to Mother's request for a DVRO.

## C. The Hearing and the Family Court's Ruling on the DVRO

At the January 25, 2022 hearing on Mother's request for a restraining order, the family court observed that the case had been assigned to another judicial officer for purposes of an upcoming long-cause hearing that involved custody and visitation issues as well as a request for at least one of the parents to move out of state. The court asked Mother's counsel if what was set forth in Mother's declaration and exhibits was the evidence supporting the DVRO request; counsel said it was and emphasized that the evidence would show Father was making false police reports to SMPD claiming that Mother had left the state in violation of court orders, which was not true.

The court then stated that Mother's evidence was insufficient to support the issuance of a restraining order. The court noted that the OFW messages were "inappropriate," and were not "helpful to [Father's] custody and visitation position." Further, "there [were] consequences, including possible criminal consequences of involving police departments or a law

9

enforcement when there isn't a legitimate reason to do that if that's what's going on.  I think at some point the police department is likely to take steps or not take seriously [Father]'s calls. . . .  I'm not saying it's never something that could be used as a form of harassment, but all that being said, I don't—I'm not inclined to restrain any of this conduct under the [DVPA].  People are entitled to invoke the police department if they have a sincere concern about child welfare, and I'm concerned about restraining that in advance.  People have a First Amendment right to petition courts for redress and to communicate regarding matters that are being litigated, and I think that the communications here, while they're not appropriate, while they may not bode well for what ultimately happens in the custody and visitation determinations that [the long-cause judge] will make, they're not, in my view, restrainable[] pursuant to the [DVPA], and that's why I didn't grant the temporary orders."

After the court indicated that it was not inclined to grant the restraining order, Mother's counsel asked that the court modify the custody and visitation order to suspend the video calls or have them professionally monitored.  The court responded, "I think that those requests [are] all within the purview of the pending request for custody and visitation that are set for hearing elsewhere. . . .  But I am not inclined . . . to approach those issues from the point of view of a domestic violence restraining order.  I don't find that on this record . . . those activities—while . . . I understand that they're annoying.  I think they may be counterproductive.  I think that may have other consequences that may be disadvantageous, but they're not domestic violence."

10

The court then addressed Father, saying "if you have something to say, I'm happy to listen to it. Although, I just ruled in your favor, and there's no obligation that you say a word. So, . . . if you want to be heard, you can certainly be heard, understanding that you probably don't want to talk me out of ruling in your favor. Yes?" Father began to state that the first time he called the police "was on April 25th," and it was "because [Mother] failed to show up for a visit." The court stopped Father, reiterated "today isn't the trial on the custody and visitation," and said, "I don't need to hear about context, reasons for calling . . . the police."

The court's minute order stated, "The [c]ourt finds the party requesting the order of protection did not sustain the applicable burden of proof and accordingly the request is denied."

Mother filed a timely notice of appeal.

## D.    Post-appeal Litigation

We sua sponte take judicial notice of the following post-appeal activities. (Evid. Code, §§ 452, subd. (d), 459, subd. (a).)

On June 2, 2022, Mother filed another request for a DVRO, which she based, in part, on Father's alleged use of OFW messages to harass her. On July 18, 19, and 22, 2022, the family court (Judge Joshua D. Wayser) conducted a hearing on Mother's request for a restraining order as well as a custody trial. The court's July 22, 2022 minute order indicates Mother "has not met her burden of establishing a right to a [restraining order] under the DVPA and her request for such relief is denied."

The court's final custody judgment granted sole legal and physical custody of the children to Mother; Mother's move away request to relocate to Florida with the children; and unmonitored, overnight visitation for Father with the children every first,

11

third, and if applicable, fifth weekend of each month in Florida, as well as for several hours each Wednesday. The court awarded Mother one video call with the children per day during Father's custodial time. However, the court's orders do not provide for Father to have any video calls with the children.

## DISCUSSION

### A. Legal Framework and Standard of Review

"The DVPA . . . authorizes the trial court to issue a restraining order 'for the purpose of preventing a recurrence of domestic violence and ensuring a period of separation of the persons involved, if an affidavit . . . shows, to the satisfaction of the court, reasonable proof of a past act or acts of abuse.' [Citations.]" (*In re Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483, 1494; see § 6300.) "Abuse is not limited to the actual infliction of physical injury or assault." (§ 6203, subd. (b).) For purposes of the DVPA, " 'abuse' means any of the following: [¶] (1) To intentionally or recklessly cause or attempt to cause bodily injury. [¶] (2) Sexual assault. [¶] (3) To place a person in reasonable apprehension of imminent serious bodily injury to that person or to another. [¶] (4) To engage in any behavior that has been or could be enjoined pursuant to [s]ection 6320." (§ 6203, subd. (a).) We broadly construe the DVPA to accomplish its purposes. (*In re Marriage of Nadkarni*, *supra*, at p. 1498.)

Section 6320 provides in relevant part that "The court may issue an ex parte order enjoining a party from molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, . . . harassing, telephoning, including, but not limited to, making annoying telephone calls as described in [s]ection 653m of the Penal Code, destroying personal property, contacting, either directly or indirectly, by mail or otherwise,

12

coming within a specified distance of, or disturbing the peace of the other party, and, in the discretion of the court, on a showing of good cause, of other named family or household members." (§ 6320, subd. (a).) " '[D]isturbing the peace of the other party' refers to conduct that, based on the totality of the circumstances, destroys the mental or emotional calm of the other party." (§ 6320, subd. (c).)

Generally, we review a trial court's decision to grant or deny a restraining order under the DVPA for an abuse of discretion. (*In re Marriage of Davila & Mejia* (2018) 29 Cal.App.5th 220, 226.) However, " '[a]ll exercises of discretion must be guided by applicable legal principles . . . which are derived from the statute under which discretion is conferred. . . . [A] discretionary order based on an application of improper criteria or incorrect legal assumptions is not an exercise of informed discretion and is subject to reversal. [Citation.]' [Citation.] 'The question of whether a trial court applied the correct legal standard to an issue in exercising its discretion is a question of law [citation] requiring de novo review [citation].' [Citation.]" (*Rodriguez v. Menjivar* (2015) 243 Cal.App.4th 816, 820-821.)

The party seeking a restraining order bears the burden of establishing the circumstances justifying the order. (*Curcio v. Pels* (2020) 47 Cal.App.5th 1, 14; see § 6300 [petitioner bears the burden of producing "reasonable proof" "to the satisfaction of the court"].) " 'In the case where the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals, it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment. . . . [Instead] the question for a

13

reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. . . .' [Citation.]" (*Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 838.)

## B.    The Family Court Erred in Denying Mother's Request for DVRO Based on the Limited Evidence Before It

The family court ruled on Mother's DVRO request without conducting an evidentiary hearing. It accepted Mother's evidentiary presentation in her restraining order application and made no adverse credibility findings about the facts set forth in her declaration. It did not obtain any evidence or testimony from Father, and in fact specifically advised him it did not need to know the reasons that he called the police. Thus, the trial court impliedly found that even if it took all of Mother's statements and evidence as true, Mother did not carry her burden to demonstrate abuse by a preponderance of the evidence.

That was error. If one accepts Mother's evidence at face value, and does not consider any potential countervailing evidence, her evidence would compel a finding in her favor. Without needing to reach the import of the OFW and other communications, Mother presented evidence that Father called the SMPD and provided false information to have them conduct unnecessary and intrusive welfare checks seven times in a three-week period. She contended these calls were made to harass her and to attempt to obtain her address. Mother feared for her safety if Father was able to obtain her address. Further, she believed (and the evidence facially supports) that Father was using the SMPD to attempt to exercise control over her.

14

Because the court did not hear from Father, the record discloses no evidence that would suggest Father had a legitimate reason to contact SMPD to request a welfare check in at least four instances: December 9, 15, 23, and 30, 2021. Nor did the family court actually find Father had legitimate reasons for calling the police. It stated, "there are consequences, including possible criminal consequences of involving police departments or a law enforcement when there isn't a legitimate reason to do that *if that's what's going on*." (Italics added.) Indeed, the frequency of Father's calls to police in a short period of time, that they were often made mere minutes after a purported missed call, and that Father often contacted the police for a welfare check rather than contact Mother through OFW first indicates Father seized upon opportunities to harass Mother by making baseless claims to the SMPD that she had left California with the children and fomenting unnecessary welfare checks. Thus, Mother demonstrated abuse within the meaning of the DVPA.[5]

Mother argues the family court erroneously denied her request for a DVRO because of First Amendment concerns, namely that the restraining order would interfere with Father's right to petition the government. We question this framing of what occurred before the trial court.[6] The family court's

---

[5] Because we conclude the family court erred in connection with the showing made concerning the welfare checks, we need not consider Mother's argument that the OFW and other communications also constituted abuse under the DVPA.

[6] Mother also argues the family court declined to grant her request for a DVRO because her concerns could instead be addressed in the custody proceedings. We do not read the court's

15

statement that, "*I'm not saying it's never something that could be used as a form of harassment*" seems to indicate it found that there was no abuse *and* Father had a First Amendment right to petition the government, not that there was no abuse *because* Father had a First Amendment right to petition the government. For purposes of completeness, we observe "the First Amendment does not guarantee the right to harassment of another." (*Doe v. McLaughlin* (2022) 83 Cal.App.5th 640, 656.) Nor does restricting speech that is abusive under the DVPA "amount to a prohibited restraint of protected speech." (*In re Marriage of Evilsizor & Sweeney* (2015) 237 Cal.App.4th 1416, 1428; see also *Altafulla v. Ervin* (2015) 238 Cal.App.4th 571, 581 [holding § 6320 is not unconstitutional because " '[t]he "protection of innocent individuals from fear, abuse or annoyance at the hands of persons who employ the telephone, not to communicate, but for other unjustifiable motives," is . . . a compelling interest' " for which the First Amendment must " ' "give way" ' "].) Thus, to the extent Father called the police to conduct welfare checks without a legitimate basis for the purpose of harassing Mother, he had no First Amendment right to do so.

Mother asserts the remedy for the family court's error is to remand with instructions to enter the requested restraining order. What Mother overlooks is that the family court did not

comments as improperly stating modification to custody orders was a proper substitute for a DVRO even if abuse was shown. Instead, the court determined Father's acts did not constitute domestic violence and then attempted to console Mother that her request to have the video calls monitored or suspended was within the purview of the custody proceedings and could still be addressed.

provide Father with an opportunity to present countervailing evidence or testimony; when Father attempted to do so, the court noted it had already ruled in Father's favor and it was not necessary. Nor do we know if Mother would have evidence or testimony that would contradict whatever Father presents, or what credibility findings the court might make after hearing from Mother, Father, and any other relevant witness(es). Thus, the proper remedy is to remand for an evidentiary hearing. We note that while this appeal has been pending, Mother brought another DVRO request that resulted in a multi-day hearing, and we express no opinion on the possible preclusive effect (if any) of that or any other subsequent litigation on the factual assertions made in connection with the restraining order request at issue in this appeal.

## DISPOSITION

The family court's January 25, 2022 order denying Mother's DVPA restraining order is reversed. The matter is remanded to the family court with instructions to conduct an evidentiary hearing pursuant to the DVPA following issuance of this court's remittitur.

Each party shall bear their own costs on appeal.


WEINGART, J.

We concur:



CHANEY, J.                           BENDIX, Acting P.J.


17

Filed 10/18/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JAN F., | B322439 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. 20STPT02373) |
| v. | |
| NATALIE F., | |
| Defendant and Appellant. | |

THE COURT:

      The opinion in the above-entitled matter filed on September 20, 2023, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.

_____

WEINGART, J.      CHANEY, J.      BENDIX, Acting P. J.