Filed 12/29/23  Sophy v. Voss CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| CHARLES SOPHY, | B323691 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. 21SMRO00077) |
| v. | |
| BRUCE VOSS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark A. Juhas, Judge.  Affirmed.

Law Offices of James R. Eliaser and James R. Eliaser for Defendant and Appellant.

El Dabe Ritter Trial Lawyers and Joshua E. Ritter for Plaintiff and Respondent.

Bruce Voss and Charles Sophy were in a committed relationship for many years. The relationship deteriorated, and over the course of a few months in early 2021, Voss placed a series of GPS trackers and audio recorders in Sophy's car, used the trackers to locate Sophy without his knowledge or consent, and followed Sophy to at least two locations. Sophy ultimately filed a request for a domestic violence restraining order, which the trial court granted first on a temporary basis and later, after a noticed hearing, for a term of five years. Voss appeals the issuance of the five-year restraining order and we consider, in the main, whether the trial court misinterpreted relevant legal standards and lacked sufficient evidence to support the ruling it made.

## I.  BACKGROUND

### A.      *Sophy's Request for a Restraining Order*

Sophy and Voss entered into a domestic partnership in the early 2000s. They have one adult child, Benjamin Sophy-Voss (Son), and two dogs.[1] They jointly own two homes, one in Beverly Hills and one in Rancho Mirage.

In late April 2021, Sophy filed a Judicial Council form DV-100 request for domestic violence restraining order seeking protection for him and Son and compelling Voss to move out of their home in Beverly Hills. In support of his request, Sophy attached a declaration attesting to certain events we now summarize.

---

[1]      Son was twenty years old at the time of the hearing on the restraining order.

Earlier in March 2021, Voss found Sophy at an apartment building in Anaheim and forced his way into the apartment after taking photos of Sophy's car in the parking lot. Voss was forced out of the apartment before Sophy encountered him. Sophy confronted Voss about the incident afterward, and Voss started yelling and screaming at Sophy. The incident made Sophy believe he was being tracked in some way.

A few days after the Anaheim incident, Sophy's car, which had previously been in perfect condition, started shaking and ultimately exploded on the side of a freeway. Voss, whose number Sophy had previously blocked, called Sophy shortly thereafter. Sophy was frightened both by the timing of the call and because Voss's number was unblocked. Voss also called Son and told him he knew about the explosion because he had been tracking Sophy.

Sophy thereafter traveled to pick up a replacement vehicle from a car dealership. Voss arrived ahead of him and left a photo of Voss, Sophy, and Son on the driver's seat of the replacement vehicle. Upon seeing the photo, Sophy panicked and felt sick with worry. An employee from the dealership eventually found a tracker underneath the driver's seat.

Sophy later discovered another tracker in his car. He stated he was terrified of Voss's behavior and the potential continuing escalation of that behavior.

The trial court issued a temporary restraining order protecting Sophy, Son, and their two dogs, and ordering Voss to move out of the Beverly Hills home. The court set an evidentiary hearing to consider issuance of a more permanent restraining order for the following month.

*B.    The Restraining Order Evidentiary Hearing*

The hearing on Sophy's request for a restraining order took place over a series of days in late July and early August 2022. Sophy testified and called several third party witnesses, including Son, the residents who lived at the Anaheim apartment where Voss was alleged to have barged in, and car dealership employees. Voss also testified to provide his own account of the events in question and Voss called additional witnesses to opine on Sophy's character.[2]

*1.    Sophy's presentation of evidence*

There was general testimony during the hearing, from Sophy and Son, concerning the often contentious relationship between Sophy and Voss. Son testified he witnessed Voss threaten Sophy with violence more than ten times and follow through with violence two or three times in the months leading up to issuance of the temporary restraining order. Verbally, Voss threatened he would ruin Sophy's reputation, said no one could have Sophy if he could not have Sophy, threatened to run away with Son, and alternately threatened to kill Sophy or himself. Son specifically recalled an incident shortly before issuance of the temporary restraining order in which Voss and Sophy were engaged in a verbal altercation in the kitchen and Voss got in Sophy's face and shoved him.

---

[2]    The reporter's transcript of the hearing indicates a number of exhibits were admitted in evidence but no party has transmitted any exhibits to this court.

4

Son also described an incident that occurred in the years prior to the issuance of the temporary restraining order when he heard Voss and Sophy arguing in another room. Son heard Sophy tell Voss to "stop" and then heard what sounded like a slap, which Son characterized as "definitely a hand on body contact."[3] Son entered the room and Sophy appeared shaken. Sophy shoved Voss away from him.

Sophy testified Voss had been violent toward him in the months leading up to issuance of the temporary restraining order. The prior Christmas, for example, Voss became angry about shirts he received as Christmas gifts and threw the shirts at Sophy.

Sophy testified he had been afraid of Voss every day and believed Voss had no ability to control himself. Son asked to be included in the restraining order because he too was sometimes afraid of Voss; he was specifically afraid Voss would retaliate against him in a violent manner.

There was also more specific testimony at the hearing concerning the time when Voss confronted Sophy at the apartment in Anaheim in early March 2021. Sophy went to the apartment one morning to visit with one of the three tenants. When another of the tenants returned from a morning session at the gym, he observed Voss taking pictures of Sophy's vehicle, which was parked in the apartment's parking garage. Voss told the man he was interested in buying a vehicle like Sophy's. The man said he knew someone who could tell Voss more about the

---

[3]     Sophy confirmed Voss slapped him.

5

car and went upstairs to his apartment, believing that Voss was waiting in the garage.

When the man arrived at his apartment door and began to open it, he realized Voss was behind him. Voss pushed past the man and walked into the apartment. A female tenant, who had just gotten out of the shower and was covered only by a towel, screamed. The tenants then pushed Voss out of the apartment (Sophy did not emerge from one of the apartment's rooms until Voss was gone). The tenants eventually reported the incident to the police.

Later in March 2021, Sophy was driving on the freeway when his car began to shake. He pulled over to the side of the road and exited the car. Shortly thereafter, the vehicle was engulfed in flames. Voss spoke with Son later that day and told Son he saw the remains of the vehicle after the fire because he had placed a tracker on Sophy's car.[4]

There was also other testimony at the hearing about vehicle tracking devices Voss placed on Sophy's mode of transportation. Jacob Dutton was working at Sophy's preferred car dealership in late March 2021, and Voss arrived at around 10:30 or 11:00 a.m. Voss knew Sophy was picking up a new car and said he wanted to surprise him by having Dutton leave a framed photograph of Voss, Sophy, and Son on the car seat. Voss also asked to see Sophy's new car. Dutton was called away just after the car was moved to the delivery bay, and Voss was left

---

[4] At some later point, Sophy went to the salvage yard to try to recover some of his belongings from the remains of his car. He discovered a tracker under the driver's seat.

alone with the unlocked car for approximately ten minutes. Voss hid when he believed Sophy was close to arriving.

Sophy arrived at the dealership. When he found the photograph inside the car, he screamed and asked if Voss was there. Upon receiving confirmation that he was, Sophy left immediately. At Sophy's request, Dutton searched the car and eventually found a tracking device under the driver's seat. Sophy was afraid, and took this as a sign that Voss was out of control.

Sophy presented evidence of other tracking and recording devices as well. In late April 2021, Sophy discovered an audio recorder in his car. Juan Vega, a mechanic at Sophy's car dealership, discovered another tracking device in Sophy's car on May 5, 2021.

In addition, Sophy presented evidence that Voss continued to contact him even after issuance of the temporary restraining order (and in apparent violation of it). Sophy's call log indicated Voss called Sophy twice after the service of the temporary restraining order. Sophy also received text messages from numbers he did not recognize, but he believed Voss sent the messages based on their content.

### 2. *Voss's presentation of evidence*

Voss testified Sophy's behavior changed significantly, and for the worse, in early 2021. He was increasingly agitated, anxious, irritable, and explosive, and he began sneaking around their house and avoiding Voss. Voss learned Sophy had cheated on him a few years prior, and confronted Sophy. Sophy eventually admitted to the infidelity. According to Voss, Sophy was also giving "mixed messages" and exhibiting paranoia. Based on Sophy's behavior, Voss worried drugs were involved. As

7

a result, Voss purchased a GPS tracking device and placed it on Sophy's car on March 1.[5]

Voss tracked Sophy using the GPS tracker in the days leading up to the Anaheim apartment incident. On the day of the incident, Voss drove to Anaheim to follow the tracker because he claimed to have thought there was an inconsistency between where Sophy told Voss he would be and where the tracker indicated he was located. He followed a car into a gated parking garage near an apartment complex, located Sophy's car, and took photographs of it. According to Voss, when the male apartment tenant approached him in the garage, Voss mentioned Sophy by name and the tenant asked Voss if he wanted to go up to say hello. Voss followed him and entered the apartment. He didn't see anyone in the apartment, so he opened a door. A woman screamed. Voss moved to leave, and another of the tenants tried to "rough [Voss] up." Voss then left.

Voss also admitted he tracked Sophy's car the night it caught on fire. Sophy appeared to be in Anaheim, and Voss was driving to find him. Partway through the drive, the tracker indicated Sophy was driving back toward Beverly Hills so Voss turned around and followed the tracker. He ultimately found Sophy's burned car being moved by a flatbed truck. The driver of the truck told Voss that Sophy made it out alive. Voss called Son, who told him Sophy was okay. Voss told Son he was standing by

---

[5]     Voss testified he purchased a total of five tracking devices and two recording devices. Voss also hired a private investigator, who provided him with bank statements from Sophy and his business.

Sophy's car. When Son asked how he found it, Voss said he had put a tracker on the vehicle.

Voss testified he discovered the time and place Sophy was set to pick up his new car. He believed Sophy was in rehab, and wanted to express his support for Sophy.

Voss arrived at the dealership at which Sophy was set to obtain his car early, so he took a drive and happened to drive past Sophy in his rental vehicle with one of the Anaheim apartment's tenants. Voss followed them and saw them go into a restaurant. Voss lost track of them and went to wait for Sophy at the dealership. Before Sophy arrived, Voss put a new tracker beneath the driver's seat. Dutton put the framed photograph of Voss, Sophy, and Son on the driver's seat per Voss's request.

Voss denied sending text messages to Sophy after being served with the temporary restraining order, and he also denied directing anyone else to do so. He argued the screenshots purportedly demonstrating Sophy had missed calls from his number were fake or manipulated. Voss did admit to sending Sophy one email after the service of the restraining order, but Voss asserted he did not know emails were prohibited by the restraining order. Voss also admitted to calling Son right after service of the temporary restraining order. Voss said he told Son he loved him but would not forgive him for calling to make sure he was present when the process servers arrived to serve the order.

Voss denied slapping Sophy during the incident Son described, stating the sound Son heard was the sound of a hand slapping the wooden floor. He also denied throwing Christmas gifts at Sophy.

In addition to testifying himself, Voss called witnesses to provide character testimony of sorts regarding Sophy. One witness who knew Sophy through a musical artist with whom they were both acquainted testified Sophy prescribed him medication without his knowledge. One of Son's former nannies testified she left her employment because Sophy made her uncomfortable and their employment relationship was abusive. She also testified Sophy used to medicate Son and write him prescriptions, but Sophy refused to tell Son's school that Son was on medication.[6]

## C.    *The Trial Court Grants the Restraining Order*

The trial court stated the case turned on the trackers, the photograph incident at the dealership, and the incident at the apartment in Anaheim.[7] The court granted the restraining order and exercised its discretion to grant Son's request to be an additional protected person under the order. In the court's view, when one person in a relationship tracked the other person and

---

[6]    Voss desired to present additional character witnesses to speak to Sophy's general character, but the trial court deemed it irrelevant and declined to allow Voss to do so.

Voss also asked the court for an order allowing his expert to examine Sophy's electronics in an effort to establish he had not contacted Sophy after the service of the restraining order. The court denied Voss's request because it determined the post-service contact was irrelevant.

[7]    The court expressly did not rely on Sophy's allegations regarding post-service contact or the allegation that Voss caused Sophy's car to catch on fire.

10

put listening devices in their car, regardless of whether that behavior amounted to criminal stalking, it constituted statutorily prohibited harassment and disturbing the peace of the other person. Although Voss testified he placed the trackers out of concern for Sophy's safety, the court believed the pertinent question was the victim's subjective interpretation, not the perpetrator's claimed intent.

Given the repetitive nature of the harassment, the court issued the restraining order for five years, until July 31, 2027. The order required Voss to move out of the home and gave Sophy the exclusive ability to use, control, and possess the property. The court declined to order the parties to switch residences because Voss had demonstrated he had no problem using recording devices and tracking devices.

## II. DISCUSSION

Voss has not demonstrated the trial court abused its discretion in issuing the restraining order. Substantial evidence supports the trial court's determination that Voss disturbed Sophy's peace, and disturbing the peace is both a sufficient ground upon which to issue a domestic violence restraining order and one that does not require any particular mental state on the part of the restrained person. Substantial evidence also supports the trial court's order requiring Voss to remain out of the parties' jointly owned Beverly Hills home because there is sufficient evidence that Voss assaulted or threatened to assault Sophy. Voss's remaining contentions of error are forfeited for failure to support them with reasoned argument.

11

*A.    Background Law*

The Domestic Violence Prevention Act (Fam. Code, § 6200, et seq.) (DVPA) "permits the trial court to issue a protective order 'to restrain any person for the purpose' of preventing a recurrence of domestic violence and ensuring a period of separation of the persons involved; the petitioner must present 'reasonable proof of a past act or acts of abuse.'" (*Rodriguez v. Menjivar* (2015) 243 Cal.App.4th 816, 820.)  Abuse is "not limited to the actual infliction of physical injury or assault."  (Fam. Code § 6203, subd. (b).)

Under the DVPA, the trial court is authorized to issue a protective order "to restrain any person" for the purpose of preventing domestic violence, "if an affidavit or testimony and any additional information provided to the court . . . shows, to the satisfaction of the court, reasonable proof of a past act or acts of abuse."  (Fam. Code, §§ 6300, subd. (a); 6220; see *In re Marriage of F.M. & M.M.* (2021) 65 Cal.App.5th 106, 116.)  Family Code section 6300, subdivision (a) further provides:  "The court may issue an order under this part based solely on the affidavit or testimony of the person requesting the restraining order."

Domestic violence under the DVPA includes "abuse perpetrated" against "[a] spouse or former spouse" or "[a] child of a party."  (Fam. Code, § 6211, subds. (a) & (e).)  The term "'abuse' means . . . [¶] . . . [¶] (4) To engage in any behavior that has been or could be enjoined pursuant to [Family Code] Section 6320."  (Fam. Code, § 6203, subd. (a)(4).)  As described in more detail, *infra*, "disturbing the peace of the other party" is among the conduct that can be enjoined by that section. (Fam. Code, § 6320, subds. (a), (c).)

12

"The trial court's issuance of a restraining order under the [DVPA] is a discretionary matter." (*McCord v. Smith* (2020) 51 Cal.App.5th 358, 364-365.) Where the trial court's exercise of discretion rests on a disputed interpretation of governing legal principles, we review the interpretation de novo. (*Eneaji v. Ubboe* (2014) 229 Cal.App.4th 1457, 1463.) Where the exercise of discretion rests on the resolution of disputed facts, we review the trial court's factual findings for substantial evidence. (*Curcio v. Pels* (2020) 47 Cal.App.5th 1, 12.)

> B.   *The Trial Court Did Not Misunderstand the Law, and Substantial Evidence Supports Its Issuance of the Restraining Order*

Voss argues that in order for him to have been found to have committed domestic violence, and in order for the restraining order against him to be proper, he must have had some "evil" intention or motive in committing the acts in question. In so arguing, Voss cites the Penal Code section 646.9 definition of criminal stalking (which requires "a credible threat with the intent to place [a] person in reasonable fear for his or her safety"), the Code of Civil Procedure section 527.6 definition of harassment (a course of conduct "that seriously alarms, annoys, or harasses [a] person, and that serves no legitimate purpose"), and the Family Code section 6320 definition of coercive control ("unreasonably engaging" in certain enumerated behaviors). Voss contends every action he took was based on a desire to help Sophy and therefore could not have constituted domestic violence.

The trial court did not misunderstand the law. The court's order was based partly on its finding that Voss had disturbed

13

Sophy's peace, a form of abuse under the DVPA. (Fam. Code, §§ 6203, subd. (a)(4); 6320, subd. (c).) "'[D]isturbing the peace of the other party' refers to conduct that, based on the totality of the circumstances, destroys the mental or emotional calm of the other party. This conduct may be committed directly or indirectly, including through the use of a third party, and by any method or through any means including, but not limited to, telephone, online accounts, text messages, internet-connected devices, or other electronic technologies. This conduct includes, *but is not limited to*, coercive control, which is a pattern of behavior that in purpose or effect unreasonably interferes with a person's free will and personal liberty." (Fam. Code, § 6320, subd. (c), italics added.) The court's finding that Voss had disturbed Sophy's peace did not require Voss to have had any particular intent in committing the relevant behavior. While "coercive control" is a form of disturbing a party's peace and an "[e]xample" of coercive control involves "unreasonably engaging in" specified behaviors, the trial court did not find Voss engaged in "coercive control."

The trial court's restraining order is also supported by sufficient evidence. Voss placed five GPS trackers and two recording devices in Sophy's vehicles over the course of approximately three months. He used those tracking devices to follow Sophy to a location on at least three occasions. The first time, he took advantage of an opportunity to enter an apartment belonging to individuals he did not know in hopes of discovering Sophy there. Though he did not encounter Sophy, Sophy was present in the apartment and was affected by Voss's actions. The second time, Voss used the tracker to locate Sophy's car the night it happened to have serious trouble and tracked it to a junkyard,

14

after which he admitted to Son that he had tracked Sophy. The third time, Voss tracked Sophy to a restaurant, which he observed Sophy entering with a companion. The same day, he visited the dealership where he knew Sophy was set to pick up his new car, and both planted a tracker on the new car and asked the salesperson to place a framed photograph of Sophy, Voss, and Son in the car. Sophy was disgusted, scared, and shocked when he discovered the framed photograph. The evidence of Voss's actions was sufficient to support the trial court's finding that Voss's behavior destroyed Sophy's mental or emotional calm.[8]

C.      *Substantial Evidence Supports the Trial Court's Order Excluding Voss from the Beverly Hills Residence*

The DVPA authorizes a court to issue a restraining order excluding a person from the "family dwelling" or "common dwelling of both parties . . . on the conditions the court determines, regardless of which party . . . is the lessee of the dwelling." (Fam. Code, § 6321, subd. (a); see § 6218, subd. (b).) "The court may issue an exclusion order[, however,] only on a showing that: (1) the party who will stay in the dwelling has a right under color of law to possess the property; (2) the party to be excluded has assaulted or threaten[ed] to assault the other party; and (3) physical or emotional harm would otherwise result to the other party. (Fam. Code, §§ 6321, subd. (b)(1)-(3), 6340,

---

[8]      We therefore need not resolve Voss's arguments regarding the definitions of "stalking" and "harassment" in Family Code section 6320.

15

subd. (a)(1).)  And finally, the court also has authority to issue orders determining the temporary use, possession, and control of real or personal property of the parties and the payment of any liens or encumbrances coming due during the period the order is in effect.  (Fam. Code, § 6324.)"  (*Nicole G. v. Braithwaite* (2020) 49 Cal.App.5th 990, 999.)

Voss contends the trial court erred in excluding him from the Beverly Hills residence because Sophy presented no evidence that Voss assaulted or threatened to assault either Sophy or Son.[9] That does not square with the record.  Son testified Voss had previously threatened to kill Sophy.  He also testified Sophy and Voss engaged in an altercation in his presence when Voss shoved Sophy.  Sophy also testified that during an argument (the argument Son overheard but did not witness), Voss slapped Sophy.  This testimony satisfied the statutory requirements for an order excluding Voss from the family home.

### D.    *Voss's Remaining Arguments Are Forfeited*

"To demonstrate error, [an] appellant must present meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error." (*In re S.C.* (2006) 138 Cal.App.4th 396, 408.)  An appellant's "burden requires more than a mere assertion that the judgment is wrong.  'Issues do not have a life of their own:  If they are not raised or supported by argument or citation to authority, [they

---

[9]    Voss does not challenge the sufficiency of the evidence as to the other two requirements for an exclusion order under Family Code section 6321.

16

are] . . . waived.' [Citation.]  It is not our place to construct theories or arguments to undermine the judgment and defeat the presumption of correctness.  When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived." (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852.)

Three of the six sections of Voss's brief—those arguing that Voss was denied a fair hearing, that the trial court erred in finding Sophy's credibility irrelevant, and that there was no evidence Son and the dogs should have been included as protected persons under the restraining order—are comprised solely of quotations from the record with conclusory assertions of error.  That is not enough.  Without a developed argument for why the trial court erred, the points are forfeited.  (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956; see also *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 [appellants challenging the sufficiency of the evidence must set forth in their brief all the material evidence on the point and not merely their own evidence; "the error is deemed to be waived" if this is not done].)

## DISPOSITION

The trial court's order is affirmed.  Sophy is awarded costs on appeal.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



BAKER, J.

We concur:


RUBIN, P. J.


KIM, J.